IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | |
|---|---|
| BARBARA "BASIA" LUKASZCZYK, WENDY A. ROGOWSKI, TOMAS MACKEVICIUS, CHERRYL GUTHRIE-WILSON, VANESSA BARRERA, ANTONETA PALIK, CRISTINA VALLE, LYNETTE TAYLOR, LATEHESHA FITCH, MARY ELIZABETH "BETSY" KOSENKA, individually and on behalf of similarly situated employees and contractors of COOK COUNTY, <br><br> Plaintiffs, <br><br> v. <br><br> COOK COUNTY, HEKTOEN INSTITUTE FOR MEDICAL RESEARCH, LLC, and GOVERNOR JAY ROBERT PRITZKER, <br><br> Defendants. | 2021 CV 5407 |

**COMPLAINT**

Now Come BARBARA "BASIA" LUKASZCZYK, WENDY ROGOWSKI, TOMAS MACKEVICIUS, CHERRYL GUTHRIE-WILSON, VANESSA BARRERA, ANTONETA PALIK, CRISTINA VALLE, LYNETTE TAYLOR, LATEHESHA FITCH, MARY ELIZABETH "BETSY" KOSENKA, individually and on behalf of similarly situated employees and contractors of COOK COUNTY, by and through their attorney, JONATHAN LUBIN, and Complain of COOK COUNTY, HEKTOEN INSTITUTE FOR MEDICAL RESEARCH, LLC, and GOVERNOR JAY ROBERT PRITZKER, stating:

1. In March, 2020, American life was irreparably changed both by COVID-19 and by the various governments' response to it. During that time, paramedics – who were already heroes – began to become ever more vital to the health and safety of millions of Americans. During that time, health care workers were on the front lines of society, granted "essential worker" status due to the recognition of their importance in keeping society afloat during these trying times. As a result, many of these essential workers were put in contact, early on, with COVID-19 positive patients, and many contracted COVID-19 as a result.

2.      Now, the Governor of the State of Illinois, the Cook County, and Hektoen Institute, LLC are threatening to terminate employees in any arguable aspect of providing public health unless they agree to take a vaccine for the SARS-COV-2 virus that causes COVID-19 (hereinafter, simply "COVID-19"), despite the fact that many of these essential healthcare workers have already contracted COVID-19, and are therefore largely immune to contracting it again.

3.      The implication that these essential workers and heroes are somehow public health hazards is wrong, and does a disservice to them and to the health of the people in this State.

**Parties**

4.      Barbara "Basia" Lukaszczyk is an employee of Hektoen Institute for Medical Research, LLC as a Clinical Research Associate. She has direct contact with patients and does not believe she has contracted COVID-19.

5.      Wendy A. Rogowski, PA-C is an employee of Hektoen Institute for Medical Research, LLC as a Physician Assistant/Project Coordinator. She has direct contact with patients and does not believe she has contracted COVID-19.

6.      Tomas Mackevicius is an employee of Hektoen Institute for Medical Research, LLC as its Chief Information Officer. He does not have contact with patients and does not believe he has contracted COVID-19.

7.      Cherryl Guthrie-Wilson is an employee of the John H. Stroger, Jr. Cook County Hospital. She is a registered nurse and works in the infusion center. She therefore has direct contact with patients. She does not believe that she has had COVID-19.

8.      Vanessa Barrera is an employee of the Hektoen Institute for Medical Research, LLC as a clinical research associate/medical assistant. She has direct contact with patients and has not had COVID-19.

9.      Antoneta Palik is an employee of John H. Stroger, Jr. Cook County Hospital. She is a ward clerk with the critical care unit and has indirect contact with patients. She has had COVID-19.

10.     Cristina Valle, MA, LPC is an employee of Cook County. She works in the Cook County Health System providing mental health services to the Cook County Jail as a Mental Health Specialist III. She suspects that she contracted COVID-19 early in 2020.

11.     Lynette Taylor, MA, LPC is an employee of Cook County. She works in the Cook County Health System providing mental health services to the Cook County Jail as a Mental Health Specialist III. She suspects that she contracted COVID-19 in early 2020.

12.     Latehesha Fitch, LCPC, is an employee of Cook County. She works in the Cook County Health System providing mental health services to the Cook County Jail as a Mental Health Specialist III. She has already had COVID-19.

13.     Mary Elizabeth "Betsy" Kosenka, LCSW, is an employee of Cook County. She works in the Cook County Health System providing mental health services to the Cook County Jail as a Mental Health Specialist III. She has already had COVID-19.

14.     Cook County is a municipal corporation located in the Northern District of Illinois, Eastern Division.

15.     Hektoen Institute for Medical Research, LLC, is corporation located and doing business on Cook County. Hektoen provides invaluable services to the John H. Stroger Cook County Hospital, and to its patients.

16.     Governor Jay Robert Pritzker is the governor of the State of Illinois. He wrote the Executive Order (Executive Order 2021-22) that is at the center of the controversy surrounding the threatened termination of Plaintiffs and other Cook County employees and contractors.

**Jurisdiction and Venue**

17.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the

Complaint seeks equitable relief and damages under federal statutes and the US Constitution.

18.     This Court has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367

because the state-law claims are integrally related to the federal claim0s.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the relevant events took

place in the Northern District of Illinois.

### Facts Common to All Counts

20.     COVID-19 is a virus that was first detected in Wuhan, China, and eventually made its way to

the United States of America, setting off a chain of events that has irretrievably changed the day-to-

day life of many if not most Americans.

21.     When the virus first appeared in the United States, some believed that the number of deaths

in America would reach 2.2 million[1]. This was based upon an assumption that the Infection Fatality

Ratio was as high as 9% in some populations.

22.     Despite these terrifying predictions, essential workers continued to interact with the public,

frequently exposing themselves to people who were positive for COVID-19 in the process.

23.     Cook County Jail employees in particular were hard hit by COVID-19. Early in the

pandemic, the Cook County Jail was considered one of the largest clusters of COVID-19 in the

United States[2] [3] [4].

---

[1] Report 9: Impact of non-pharmaceutical interventions (NPIs) to reduce COVID-19 mortality and healthcare demand, accessed at https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.
[2] https://blockclubchicago.org/2020/04/14/181-cook-county-jail-staffers-have-coronavirus-remaining-guards-are-overworked-forced-to-cut-corners-union-says/
[3] https://www.propublica.org/article/cook-county-jail-covid-oral-histories
[4] https://blockclubchicago.org/2020/09/02/cook-county-jail-officers-demand-hazard-pay-for-working-for-months-in-coronavirus-hot-spot/

24.     It goes without saying that any individual providing health services within a hospital, like John H. Stroger, Jr. Hospital of Cook County, was at risk of contracting COVID-19 at many different times during the pandemic; this was not lost on many Stroger employees, who complained of suboptimal conditions in the prevention of COVID-19 early on in the pandemic[5] [6].

25.     Until now, no defendant required employee providing health services to engage in periodic COVID-19 testing.

26.     This was true despite the fact that case rates in Illinois were highest in the fall and winter of 2020, were higher in May of 2020 and April of 2021 then they are today, and are presently on a downward trend[7].



---

[5] https://khn.org/news/hospital-workers-complain-of-minimal-disclosure-after-covid-exposures/
[6] https://www.fox32chicago.com/news/1500-cook-county-employees-walk-off-the-job-for-one-day-strike
[7] http://dph.illinois.gov/covid19/covid19-statistics

27.     Relatively speaking, it is safer to be an Illinois resident today than at several different points, spanning weeks and months, over the last 18 months. Still, no vaccinations were required, despite widespread availability beginning in 2021.

28.     The National Institute of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity caused by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spoke protein of the COVID-19 virus remain in 98% of people who have recovered from the virus 6 to 8 months after infection (and the outer limit of the study was simply because the study was done on individuals who were 6 to 8 months out of recovery, not because immunity begins to wear off[8]).

29.     Health and Human Services' Assistant Secretary, Dr. Admiral Bret Diroir stated in August, 2021, in a nationally televised interview that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."

30.     Even Dr. Anthony Fauci, one of the vaccines' chief proponents, admitted in September, 2021, while being interviewed on CNN that "I don't have a firm answer," on whether the vaccines offer immunity that was comparable to natural immunity.

31.     The data out of the State of Israel underscores this point. In a paper that is awaiting peer review, scientists out of the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of COVID-19 over those whose immunity was natural[9].

---

[8] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19
[9] https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf

32.     Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of COVID-19 has demonstrated that the vaccine is only 64% effective at preventing symptomatic cases of COVID-19[10].

33.     Despite its high vaccination rates, Israel is becoming "the world's COVID hotspot."[11]

34.     Here in this country, the now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (that is, re-infection after either contracting COVID-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that of those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections[12].

35.     Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity[13] [14]. Further, those who previously were infected with COVID-19 were at greater risk for bad side effects associated with the vaccine, and that the vaccine might even weaken their pre-existing immunity[15].

36.     While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-19, and, therefore, transmission of COVID-19.

37.     On September 3, 2021, Governor Pritzker issued Executive Order 2021-22. That order requires any Health Care Worker to have the first dose of a COVID-19 vaccine by September 19,

---

[10] https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reason/
[11] https://www.dailymail.co.uk/news/article-9951117/Israel-worlds-Covid-hotspot-0-2-population-catching-yesterday.html
[12] https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3
[13] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3838993
[14] https://www.nature.com/articles/s41586-021-03647-4
[15] https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1

2021, and to have taken a second dose within 30 days after the first dose. EO 2021-22(2)(b), attached as Exhibit A.

38.     Health Care Workers include any person who is employed by a Health Care Facility (other than state-owned facilities) and have frequent contact with patients and personnel within the facility. People who are incidentally employed by a Health Care Facility but do not have frequent contact with those inside such a facility (for example, the Chief Information Officer of a Contractor with Stroger Hospital), are not included.

39.     The executive order is a continuation of the state of emergency declared by the Governor in March, 2020, pursuant to the Illinois Emergency Management Agency Act. 20 ILCS 3305 *et seq.*

40.     That statute states that "[u]pon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days" certain enumerated powers. 20 ILCS 3305/7.

41.     Several decisions of the Northern District of Illinois have pertained to the limitation placed on the governor by the simple text of the statute: he may exercise his power "for a period not to exceed 30 days." These decisions have largely found that so long as the governor makes new findings of fact, he may extend these emergency orders (or, more accurately, issue new orders). See, for instance, Cassell v. Snyders, 458 F.Supp.3d 981 (Ill. N.D., 2020).

42.     In the case of Cassell specifically, the Court pointed out that while the governor could extend the emergency orders, his power is not unlimited. As Cassell finds, "[o]nce an emergency has abated, the facts on the ground will no longer justify such findings, and the Governor's emergency powers will cease. And, should this or any future Governor abuse his or her authority by issuing emergency declarations after a disaster subsides, affected parties will be able to challenge the sufficiency of those declarations in court." Cassell v. Snyders, 458 F. Supp. 3d 981, 1002 (N.D. Ill. 2020).

43.     Though COVID-19 is still very much a part of the lives of nearly every Illinoisan, the cases

are presently on the wane, and there are many fewer new cases today (to say nothing of deaths) than

there were at several other points over the last 18 months.

44.     The Illinois Emergency Management Act enumerates the temporary unilateral powers of the

governor. Specifically, it lists the following powers:

> (1) To suspend the provisions of any regulatory statute prescribing procedures
> for conduct of State business, or the orders, rules and regulations of any State
> agency, if strict compliance with the provisions of any statute, order, rule, or
> regulation would in any way prevent, hinder or delay necessary action, including
> emergency purchases, by the Illinois Emergency Management Agency, in coping
> with the disaster.
> (2) To utilize all available resources of the State government as reasonably
> necessary to cope with the disaster and of each political subdivision of the State.
> (3) To transfer the direction, personnel or functions of State departments and
> agencies or units thereof for the purpose of performing or facilitating disaster
> response and recovery programs.
> (4) On behalf of this State to take possession of, and to acquire full title or a
> lesser specified interest in, any personal property as may be necessary to accomplish
> the objectives set forth in Section 2 of this Act, including: airplanes, automobiles,
> trucks, trailers, buses, and other vehicles; coal, oils, gasoline, and other fuels and
> means of propulsion; explosives, materials, equipment, and supplies; animals and
> livestock; feed and seed; food and provisions for humans and animals; clothing and
> bedding; and medicines and medical and surgical supplies; and to take possession of
> and for a limited period occupy and use any real estate necessary to accomplish those
> objectives; but only upon the undertaking by the State to pay just compensation
> therefor as in this Act provided, and then only under the following provisions:
>> a. The Governor, or the person or persons as the Governor may
>> authorize so to do, may forthwith take possession of property for and on behalf
>> of the State; provided, however, that the Governor or persons shall
>> simultaneously with the taking, deliver to the owner or his or her agent, if the
>> identity of the owner or agency is known or readily ascertainable, a signed
>> statement in writing, that shall include the name and address of the owner, the
>> date and place of the taking, description of the property sufficient to identify it, a
>> statement of interest in the property that is being so taken, and, if possible, a
>> statement in writing, signed by the owner, setting forth the sum that he or she is
>> willing to accept as just compensation for the property or use. Whether or not
>> the owner or agent is known or readily ascertainable, a true copy of the statement
>> shall promptly be filed by the Governor or the person with the Director, who

shall keep the docket of the statements. In cases where the sum that the owner is willing to accept as just compensation is less than $1,000, copies of the statements shall also be filed by the Director with, and shall be passed upon by an Emergency Management Claims Commission, consisting of 3 disinterested citizens who shall be appointed by the Governor, by and with the advice and consent of the Senate, within 20 days after the Governor's declaration of a disaster, and if the sum fixed by them as just compensation be less than $1,000 and is accepted in writing by the owner, then the State Treasurer out of funds appropriated for these purposes, shall, upon certification thereof by the Emergency Management Claims Commission, cause the sum so certified forthwith to be paid to the owner. The Emergency Management Claims Commission is hereby given the power to issue appropriate subpoenas and to administer oaths to witnesses and shall keep appropriate minutes and other records of its actions upon and the disposition made of all claims.

b. When the compensation to be paid for the taking or use of property or interest therein is not or cannot be determined and paid under item a of this paragraph (4), a petition in the name of The People of the State of Illinois shall be promptly filed by the Director, which filing may be enforced by mandamus, in the circuit court of the county where the property or any part thereof was located when initially taken or used under the provisions of this Act praying that the amount of compensation to be paid to the person or persons interested therein be fixed and determined. The petition shall include a description of the property that has been taken, shall state the physical condition of the property when taken, shall name as defendants all interested parties, shall set forth the sum of money estimated to be just compensation for the property or interest therein taken or used, and shall be signed by the Director. The litigation shall be handled by the Attorney General for and on behalf of the State.

c. Just compensation for the taking or use of property or interest therein shall be promptly ascertained in proceedings and established by judgment against the State, that shall include, as part of the just compensation so awarded, interest at the rate of 6% per annum on the fair market value of the property or interest therein from the date of the taking or use to the date of the judgment; and the court may order the payment of delinquent taxes and special assessments out of the amount so awarded as just compensation and may make any other orders with respect to encumbrances, rents, insurance, and other charges, if any, as shall be just and equitable.

(5) When required by the exigencies of the disaster, to sell, lend, rent, give, or distribute all or any part of property so or otherwise acquired to the inhabitants of this State, or to political subdivisions of this State, or, under the interstate mutual aid agreements or compacts as are entered into under the provisions of subparagraph (5)

of paragraph (c) of Section 6 to other states, and to account for and transmit to the State Treasurer all funds, if any, received therefor.

(6) To recommend the evacuation of all or part of the population from any stricken or threatened area within the State if the Governor deems this action necessary.

(7) To prescribe routes, modes of transportation, and destinations in connection with evacuation.

(8) To control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein.

(9) To suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, explosives, and combustibles.

(10) To make provision for the availability and use of temporary emergency housing.

(11) A proclamation of a disaster shall activate the State Emergency Operations Plan, and political subdivision emergency operations plans applicable to the political subdivision or area in question and be authority for the deployment and use of any forces that the plan or plans apply and for use or distribution of any supplies, equipment, and materials and facilities assembled, stockpiled or arranged to be made available under this Act or any other provision of law relating to disasters.

(12) Control, restrict, and regulate by rationing, freezing, use of quotas, prohibitions on shipments, price fixing, allocation or other means, the use, sale or distribution of food, feed, fuel, clothing and other commodities, materials, goods, or services; and perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population.

(13) During the continuance of any disaster the Governor is commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty. To the greatest extent practicable, the Governor shall delegate or assign command authority to do so by orders issued at the time of the disaster.

(14) Prohibit increases in the prices of goods and services during a disaster. 20 ILCS 3305/7.

45.     The entirety of the text is brought here to underscore what the statute does not state. The sections pertaining to the governor's power to direct traffic, ingress and egress, and commerce arguably give the governor the power to impose lockdowns. But there is no statutory authority in 20 ILCS 3305/7 that permits the governor to require vaccination of employees, or to direct the terms of their employment.

46. Further, the act specifically limits the governor's power in stating that the Act shall not be construed to "[a]ffect the jurisdiction or responsibilities of police forces, fire fighting forces, units of the armed forces of the United States, or of any personnel thereof, when on active duty; but State and political subdivision emergency operations plans shall place reliance upon the forces available for performance of functions related to emergency management." 20 ILCS 3305/3(c).

47. Cook County's President, ostensibly in response to Executive Order 2021-22, issued its own vaccination mandate (hereinafter "mandate"). This mandate requires all employees to vaccinate, including contractors with the County. Like the Governor's mandate, the Cook County mandate was an executive act of the president, and was not voted on by Cook County Commission.

48. The Cook County mandate requires any employees who have not vaccinated to be suspended without pay, regardless of whether they are willing to submit to weekly testing. While technically, the Order allows employees to seek a reasonable accommodation, as a practical matter, all of Plaintiffs have been denied for a religious accommodation.

49. For several weeks, the mandate allowed non-vaccinated employees to submit to weekly testing, but now that is not permitted. Rather, non-vaccinated employees will be suspended and then terminated.

50. Each of the Plaintiffs here sought religious exemptions, but all were denied, or their exemptions have not been responded to as the October 15 deadline nears. In some cases, the denial was on the basis that the plaintiff has not sought an exemption for the influenza vaccine in the past.

51. Some of the Plaintiffs found that, not content to simply suspend them (and ultimately terminate them) without pay, the County had distributed a color-coded statement of which employees were vaccinated and which were not, subjecting those Plaintiffs to harassment and derision.

52.     Similarly, Cook County notified Hektoen's vaccinated employees as to which employees were unvaccinated – something that Plaintiffs learned from their fellow employees, not from their employer. This subjected them to harassment and derision.

53.     The Supreme Court has recognized many times that the right to privacy (including bodily autonomy) is one of the fundamental rights protected by the constitution. For example, <u>Roe v. Wade</u>, 410 U.S. 113 (1973) points to several prior decisions of the Supreme Court identifying various amendments in the Bill of Rights as the source of this right[16].

54.     In <u>Roe</u> specifically, the Supreme Court noted that the right of women to procure an abortion existed despite the State of Texas's belief (consistent with the beliefs of many of the world's religions, and the beliefs of many people of conscience) that the life of a fetus begins at conception. *Id.* at 159. That is to say, bodily autonomy trumps even the possibility that the assertion of the same would be directly responsible for the termination of a human life.

55.     Whenever a fundamental right is implicated, the Supreme Court tells us, Courts must apply strict scrutiny in evaluating the constitutionality of the laws at issue. Specifically, Supreme Court states that the state may only threaten that interest when it is justified by a "compelling state interest," and that the "legislative enactments must be narrowly drawn to express only the legitimate state interests at stake. <u>Roe v. Wade</u>, 410 U.S. 113, 155 (1973); <u>Planned Parenthood of Se. Pennsylvania v. Casey</u>, 505 U.S. 833, 871 (1992).

56.     As the Supreme Court has found elsewhere, "[t]he guaranties of due process, though having their roots in Magna Carta's *'per legem terrae'* and considered as procedural safeguards 'against

---

[16] Specifically, it points to the First Amendment, <u>Stanley v. Georgia</u>, 394 U.S. 557, 564 (1969); the Fourth and Fifth Amendments, <u>Terry v. Ohio</u>, 392 U.S. 1, 8-9 (1968), <u>Katz v. United States</u>, 389 U.S. 347, 350 (1967); <u>Boyd v. United States</u>, 116 U.S. 616 (1886), <u>Olmstead v. United States</u>, 277 U.S. 438 (1928)(Brandeis, dissenting); the "penumbras of the Bill of Rights, <u>Griswold v. Connecticut</u>, 381 U.S. 479, 484-5 (1965); and the Ninth Amendment, *Id.*

executive usurpation and tyranny,' have in this country 'become bulwarks also against arbitrary legislation." Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 847(1992)

57.     In Washington v. Harper, 495 U.S. 210 (1990), the Supreme Court found that the forced injection of medicine implicated a "significant liberty interest." Similarly, in Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990), the Supreme Court found that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."

58.     In this case, the mandate at issue is not narrowly tailored to forward a compelling government interest.

59.     Vaccinating people is not a compelling government interest in and of itself. Rather, the government's interest is in protecting the lives and fundamental rights of the state's residents.

60.     Presently, COVID-19 cases are on the wane in Illinois, and, as stated above, there were many periods over the last 18 months when the number of new cases per day was much greater than at present. Nonetheless, there was no time during that period when weekly COVID-19 tests were required of employees or contractors. There was also no time, over the last nine months when vaccines have been available, when a vaccine mandate was put in place in the State of Illinois, or in Cook County.

61.     It is therefore evident that the weekly testing requirement is not narrowly tailored to forward the interest of preserving the life and health of Illinois' citizens; rather, it is a punitive measure taken against those who assert their fundamental rights.

62.     Given that many paramedics have already caught and recovered from COVID-19, singling out those who are not vaccinated against COVID-19 is neither narrowly tailored to nor rationall related to forwarding the interest of preserving the life and health of Illinois' citizens; those who have not had COVID-19, and whose immunity comes from vaccination, are at a much greater risk

14

of catching and transmitting COVID-19 to others than those who remain unvaccinated but who

have natural immunity.

## COUNT I
### 42 U.S.C. § 1983
### Due Process – As to the Government Defendants

63.     If Defendants are not enjoined from putting the mandate into effect, their fundamental

rights will be violated.

## COUNT II
### 42 U.S.C. § 1983
### Equal Protection – As to the Government Defendants

64.     As a result of the Executive Order, and the contemplated actions, Plaintiffs are being treated

differently from employees who are willing to disclose their vaccination status arbitrarily, and singled

out for disparate treatment.

## COUNT III
### 42 U.S.C. § 1983
### First Amendment

65.     Plaintiffs were denied religious exemptions, or their exemptions remain unapproved, despite

the fact that Cook County gave itself the discretion to grant such exemptions for good cause.



## COUNT IV
### 745 ILCS 70 *et seq* – Health Care Right of Conscience Act
### As to All Defendants

66.     Pursuant to the Health Care Right of Conscience Act:

> Discrimination. It shall be unlawful for any person, public or private
> institution, or public official to discriminate against any person in any
> manner, including but not limited to, licensing, hiring, promotion, transfer,
> staff appointment, hospital, managed care entity, or any other privileges,
> because of such person's conscientious refusal to receive, obtain, accept,
> perform, assist, counsel, suggest, recommend, refer or participate in any way

in any particular form of health care services contrary to his or her conscience. 745 ILCS 70/5.

67.     It also states:

> Discrimination by employers or institutions. It shall be unlawful for any public or private employer, entity, agency, institution, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against, any applicant, in terms of employment, admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience. 745 ILCS 70/7.

68.     Violation of the Act subjects the violator to threefold the actual damages, including pain and suffering, costs of bringing suit, and reasonable attorneys' fees.

## COUNT V
## Declaratory Judgment
## As to the Government Defendants

69.     The Executive Order, and the mandate upon which it is based, far exceeds the power of the governor granted to him by Illinois statute.

70.     The Illinois Emergency Management Act, which the governor points to as authorizing the vaccine mandates, does not give the governor the power to require employees to be vaccinated. This aspect of the Executive Order violates Illinois law and statute.

71.     Similarly, Cook County mandate was undertaken in violation of the law in that it was never approved by the Cook County Commissioners.

72.     Further, the factual basis underlying the Executive Orders are woefully inadequate to justify such an imposition on the constitutional and fundamental rights of Illinois and Cook County residents.

16

73.     Finally, the mandate, and the Executive Orders, violate the constitutional and fundamental rights of those who either choose not to be vaccinated, or choose not to disclose their vaccination status to either the state, or their employers.

**Prayer for Relief**

WHEREFORE, Plaintiffs request that this Honorable Court enter an order:

A.  Finding that the government Defendants, violated the constitutional rights of Plaintiffs;

B.  Finding that the Executive Order, and therefore the mandate, exceeds the authority granted to the governor and to governmental units granted by statute, and is therefore null and void as to the vaccine mandates complained of here;

C.  Finding that the Cook County Order, and therefore the mandate, exceeds the authority granted to the president of Cook County, and is therefore null and void;

D.  Finding that Plaintiffs have a fundamental right to their bodily autonomy, and to make health decisions in accordance with their beliefs and conscience;

E.  Ordering that Defendants be enjoined from putting the vaccine mandates contained in the Executive Order and the Cook County mandate into effect;

F.  Ordering that Plaintiffs be compensated, to the extent allowable under the law and the Constitution of the United States of America, including treble damages under Illinois Statute, for their damages; and

G.  Ordering that Defendants pay Plaintiffs' for the costs associated with bringing this lawsuit, including their reasonable attorneys' fees.

Respectfully Submitted,

s/Jonathan Lubin
Attorney for Plaintiffs

Jonathan Lubin
8800 Bronx Ave.
Suite 100H
Skokie, IL 60077
773 954 2608
jonathan@lubinlegal.com